UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE


RITA A. GARLAND                          )
                                         )
V.                                       )          NO. 2:06-CV-275
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security          )


## REPORT AND RECOMMENDATION

This matter has been referred to the United States Magistrate Judge (Doc. 13) for a

report and recommendation with respect to the motion for summary judgment of the plaintiff

(Doc. 9) and the motion for summary judgment of the defendant Commissioner (Doc. 11).

The plaintiff was found disabled and eligible for disability insurance benefits and

supplemental security income beginning October 1, 1993. The benefits were terminated as

of April 2000 by a decision of an Administrative Law Judge ("ALJ") dated May 18, 2001.

A copy of that decision by ALJ Robert L. Erwin is attached to the plaintiff's brief. On page

7 of that decision ALJ Erwin found as follows:

> The plaintiff has the residual functional capacity to perform a
> range of light work activity. The claimant is precluded from
> more than occasional climbing, stooping, bending, crouching,
> crawling, kneeling, or overhead reaching. The claimant should
> avoid frequent head movement, and requires a sit/stand option
> in one hour intervals. Due to psychological problems, the
> claimant is limited, but satisfactorily able to relate to coworkers,
> deal with the public, interact with supervisors, behave in an
> emotionally stable manner, or relate predictability in social
> situations.

The plaintiff appealed that decision to this court in Case No. 2:03-CV-06. On January 8, 2004, Senior United States District Judge Thomas G. Hull upheld the decision of ALJ Erwin.

On September 16, 2003, the plaintiff filed her present application for disability insurance benefits and supplemental security income. After the claim was denied initially and on reconsideration, a request for hearing was filed. A hearing was held before ALJ Michael J. Davenport who issued a hearing decision on December 10, 2004. At that time the plaintiff was fifty-three years of age with a high school education. She had past relevant work experience as an audio-visual technician (skilled work requiring sedentary to medium exertion); as a fast food cashier (unskilled work requiring light exertion); convenience cashier (unskilled work requiring light exertion); and an electronics technician (skilled work requiring light to medium exertion). Plaintiff alleged disability due to pain in her neck, back, arms and hands, and a mental impairment. (TR. 21). Upon ALJ Davenport's finding that she was not disabled, plaintiff seeks review by this Court.

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607

(1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988).

Two things should be borne in mind. First of all, the plaintiff was not disabled as of the date of ALJ Erwin's report and recommendation on May 18, 2001. When that administrative decision was upheld by Judge Hull on January 8, 2004, and not subsequently appealed, the decision became *res judicata*. Also it should be remembered that Judge Hull reviewed evidence submitted to the Appeals Council prior to the date of his decision and stated "The Court has reviewed all the additional evidence and does not believe it justifies a "Sentence Six" remand." *See, Rita Garland v. SSA*, 2:03-CV-6, Doc. 16, p. 7.

The following is a summary of the medical evidence relating to the plaintiff's asserted impairments as set forth by the plaintiff in her brief. It is mostly verbatim with some changes made for clarity.

The plaintiff received treatment at Lakeway Regional Hospital's Pain Management Center, by Dr. Michael Chavin, from December 10, 2001 through January 7, 2002. Dr. Chavin performed a series of three cervical epidural blocks and sacroiliac joint blocks, due to the diagnoses of cervical stenosis with degenerative changes in the cervical region, cervical radiculopathy, cervical spondylosis, sacroilitis, and sacroiliac joint pain focused off to the left (Tr. 221-241).

The plaintiff received chiropractic care from September 14, 1998 through March 21, 2003, by Gary Unferth, DC. The notes are mostly illegible and not very informative, but do note cervical spine x-rays which revealed decreased joint space at C5/C5 and subluxation at C4 and T3 and lumbar spine x-rays which revealed decreased joint space at L3/L4, pelvic unleveling, decreased disc space at L3/L4, dextro scoliosis at T7, and subluxation at T3 and T7 (Tr. 257-307).

On March 18, 2002, Dr. Frederick R. Yarid reported the plaintiff being under his care for the diagnoses of hiatal hernia, GERD, gastroparesis, and hyperlipidemia. Dr. Yarid also noted the plaintiff's chronic neck and back pain with spondylosis C5/C6/C7 for which she is under the care of Dr. Chavin, Pain Management Specialist (Tr. 328).

The plaintiff received treatment at Cherokee Health Systems from July 12, 2001 through July 18, 2002, due to checking behaviors, suicidal ideation with no plan, nightmares, hypersomnia, increased appetite, weight gain, depression, anhedonia, feelings of hopelessness, difficulty concentrating, panic symptoms, negative thoughts, anxiety, crying spells, anhedonia, increased fatigue, lethargy, decreased energy, excessive worry, chronic pain, history of post traumatic stress disorder [hereinafter "PTSD"], and situational stressors (Tr. 329-340). On July 18, 2001, mental status examination was positive for disheveled appearance, agitated motor activity, blunted affect, irritable mood, excessive rambling speech, sometimes tangential thought process, some checking behaviors, suicidal ideation with no plan, hypersomnia, nightmares, increased appetite, and weight gain. The diagnoses were depressive disorder NOS, history of PTSD, and history of generalized anxiety disorder

(Tr. 338-339). By January 18, 2002, the plaintiff continued to suffer from depression and anxiety (Tr. 336). On July 18, 2002, the plaintiff continued to suffer from depression and anxiety and her diagnoses remained depressive disorder NOS, history of PTSD, and history of generalized anxiety disorder (Tr. 335). On April 4, 2002, the plaintiff was suffering depression, increased anxiety in large places with lots of people, daily sadness, crying spells, some anhedonia, increased fatigue, lethargy, decreased energy, nightmares, and chronic pain. On exam, the plaintiff was dysphoric and tearful. The diagnoses were depression due to chronic pain, history of PTSD, and history of generalized anxiety disorder, with a global assessment of functioning [hereinafter "GAF"] of 50 (Tr. 333- 334). By January 18, 2003, the plaintiff continued to experience depressed mood and anxiety and her diagnoses remained depressive disorder NOS, history of PTSD, and history of generalized anxiety disorder (Tr. 329).

Dr. Michael A. Chavin, of Morristown Pain Consultants, treated the plaintiff in his office from November 7, 2001 through September 19, 2002. Conditions and complaints addressed include chronic intractable neck pain with muscle spasms, low back pain, right buttocks pain radiating into the groin region, numbness and tingling in the upper extremities going down into the hands, weight gain, nausea, nervousness/anxiety, depression, decreased range of motion in the neck, bilateral sacroiliitis, fluid retention, cervical stenosis, cervical degenerative disc disease, cervical radiculopathy, cervical spondylosis, sacroiliac joint pain, bilateral elbow pain, lateral epichondilitis of the left elbow, chronic fatigue, obesity, lumbosacral degenerative disc disease, lower extremity weakness, and headaches (Tr. 341-

366).

The plaintiff received treatment at Morristown Hamblen Hospital on four occasions from June 25, 1999 through October 2, 2000, due to abnormal postmenopausal uterine bleeding, pedunculated endocervical mass, epigastric pain, nausea, diarrhea, right upper quadrant abdominal pain, dilated common bile duct, and shortness of breath (Tr. 367-405). On October 2, 2000, review of systems was positive for occasional headaches, occasional night sweats, problems with GERD, abnormal bleeding, anxiety, depression, neck and back problems, and emotional problems (Tr. 369).

On December 16, 2003, the plaintiff underwent consultative examination by Alice Garland, M.S., at which time she was noted to be overweight and instructed not to drive because of her health problems. The plaintiff further reported being married and divorced five times and that she was scared to be by herself for a long time due to PTSD symptoms. On mental status exam, the plaintiff was noted to have a hard time keeping on task and lost interest quickly, her affect was blunted, and she seemed mildly irritated. Noted symptoms included inability to sleep due to pain, feeling useless and helpless, and feeling suicidal when depressed. The examiner noted the plaintiff seemed very self-focused and slightly irritable; her ability to relate was estimated to be fair; she certainly had difficulty with long-term intimate relationships; she appeared to be dysthymic, but had had bouts of major depression in the past; and she appeared to have an underlying personality disorder with both borderline and dependent features. The diagnoses were dysthymia, rule out depressive disorder NOS, pain disorder due to general medical condition, and personality disorder NOS. Ms. Garland

opined that the plaintiff did not appear to be significantly limited in her ability to do complex and detailed work, although at times pain may interfere with the plaintiff's ability to do very complex work. Plaintiff's ability to persist and concentrate was not significantly limited on the day of the exam. It was noted the plaintiff said she had difficulty keeping focused. and that her ability to get along with people and work with the public may be limited, at least intermittently, by her level of pain and her belief that she is no longer able to do anything (Tr. 415-420).

The plaintiff underwent consultative examination by Dr. Wayne Page on December 30, 2003. Dr. Page noted that no medical records were provided for review. Presenting complaints included spinal cervical stenosis, spondylolisthesis at C5-C7, numbness in her arms at different times, possible carpal tunnel syndrome, neck pain, difficulty standing, facet hypertrophy, degenerative disc disease, a sensation of something wrapped around her up to the thigh near the groin region, inability to carry more than ten pounds, GERD, hiatal hernia, hyperlipidemia, anxiety, depression, PTSD, chronic fatigue, and hypothyroidism. Systems review was positive for headaches three times a week and pain in the elbows, hips, fingers, and shoulders. The diagnoses were neck, back and arm pain and gastric dysfunction. Dr. page opined that there was nothing to support a 10 pound lifting restriction as claimed by plaintiff. He opined that she could frequently and occasionally lift and carry 25 pounds, stand and walk and sit with normal breaks for eight hours a day in an eight hour workday, and had no impairments related to hearing, speaking, vision and traveling. (Tr. 440-446).

Dr. Edie Wadsworth, of Health Star Physicians, treated the plaintiff from May 22,

2003 through March 4, 2004. Treatment was rendered for chronic back pain, chronic cervical pain, decreased energy, cervical stenosis and spondylosis, tendonitis, weight gain, chronic cervical arthritis, depression, fatigue, hypercholesterolemia, anxiety, hypothyroidism, degenerative disc disease of the cervical and lumbar spines, and dyslipidemia (Tr. 455-468). On September 11, 2003, the plaintiff complained of increased anxiety. Prozac was increased for the diagnoses of depression and anxiety (Tr. 463). On October 9, 2003, Prozac was continued to the diagnosis of depression (Tr. 459). On January 5, 2004, Zoloft was prescribed for depression (Tr. 457).

The plaintiff received treatment at Terry Humann Chiropractic from April 7, 2003 through May 11, 2004, due to neck pain, headaches, bilateral shoulder pain, radicular symptoms in hands, right hip numbness, back pain, and bilateral arm pain (Tr. 469-485).

The plaintiff returned to Cherokee Mental Health on May 18, 2004, at which time she was tearful, crying, sometimes laughing, angry, and cantankerous. It was stated that the plaintiff "pitched a fit because she lost her disability." Presenting symptoms included depression, depressed most all of the time, anhedonia, trouble sleeping because her mind doesn't quit working, fatigue, feelings of worthlessness, thoughts of hurting others. The diagnoses were major depressive disorder, recurrent, moderate; anxiety disorder NOS; and personality disorder NOS. The mental status evaluation found the defendant had a labile affect, was depressed and anxious, and that her speech was excessive and "perseverating." It also stated that her thought processes were intact; that she had no hallucinations or delusions; had no suicidal ideation; was fully oriented; had an intact memory; average

general knowledge, attention span and general intellectual functioning; that er judgment and insight were intact and that she had good impulse control. (Tr. 516-519).

On November 18, 2002, Dr. Sid Noor ordered a TENS unit for the plaintiff, due to the diagnoses of congenital spondylolysis in the lumbosacral region, cervical spine stenosis, lumbar facet synovitis, and tenosynovitis. Dr. Noor noted a lifetime need for the unit (Tr. 521-522).

The plaintiff submitted the following evidence to the Appeals Counsel after ALJ Davenport had issued his decision:

The plaintiff underwent physical assessment at East Tennessee Comprehensive Rehabilitation Center on November 17, 2004, upon referral by Dr. Wadsworth. The plaintiff gave a good effort and Symptom Magnification and Placebo Testing was negative, indicating a valid test. Physical Therapist Humann noted that due to complaints of pain in the cervical, thoracic, bilateral lower extremities, and low back, the plaintiff can barely walk at the end of the day; she has increased pain with all activities; and she states that she is unable to do any repetitive activity. On Box Lifts, she was limited to nine pounds on the Floor to Knuckle and maximum was 12 pounds from Knuckle to Shoulder; she could not perform Shoulder Overhead; she was limited to carrying for 15 feet with 9 ½ pounds; she gave a good effort, but complained of a 6/10 pain level; On Sit-and-Reach she was able to get to 11, with 16 being normal; and on the treadmill she was able to perform approximately three minutes at .8 speed before tiring and complaining of pain in her lower extremities. As a result of his evaluation, PT Humann opined the plaintiff can lift/carry a maximum of 9.5 pounds

occasionally, as demonstrated by box lifts; can stand/walk a maximum of two minutes and 57 seconds, per assessment on treadmill; can sit for a total of 45 minutes without interruption, per verbal complaints of pain; is unable to crawl and can do minimal climbing, stooping, kneeling, and/or crouching, per observation with physical assessment; with physical functions affected being reaching, handling, and push/pulling, due to pain with activity and limited abilities demonstrated with increased pain; and environmental restrictions of moving machinery and vibration, due to increased pain. PT Humann noted the plaintiff's obvious pain with lifting, stooping, bending, or prolonged standing, as observed in testing (Tr. 559-569).

The plaintiff was transported to Takoma Adventist Hospital by ambulance/EMS on September 29, 2005, at which time she was noted to be confused and emotionally distressed. Noted symptoms included flashbacks, begging Jesus to take her, chest pain due to stress, headache, nausea, emotional lability, pressured speech, depressed affect, and tearfulness. The final diagnosis was manic depressive illness (Tr. 577-586).

The plaintiff underwent consultative examination by Dr. Gordon Hoppe on August 31, 2005. Presenting complaints included neck pain, low back pain, multiple altercations by an abusive spouse, anxiety, depression, and suicidal ideation at times. On exam, the plaintiff talk continuously in a monotone voice; her gait was unsteady and broad based; she could get up from a chair with difficulty as well as on and off the table, and required assistance; she was able to grasp and manipulate objects with some difficulty; she had decreased motion in the neck with flexion to 30 degrees, extension to 30 degrees, right and left lateral flexion to

20 degrees bilaterally, and right and left rotation to 40 degrees bilaterally. The dorsolumbar spine showed flexion to 45 degrees. The diagnoses were cervical, thoracic and lumbar pain and severe anxiety/depression. Dr. Hoppe opined the plaintiff retains the capacity to lift or carry less than five pounds, frequently lift or carry less than five pounds, stand or walk less than two hours in an eight-hour day, and sit with normal breaks for less than six hours in a normal day (Tr. 587-591).

On April 21, 2005, Dr. Edie Wadsworth opined the plaintiff has no useful ability to function (poor/none) in the areas of deal with public; deal with work stresses; function independently; maintain attention and concentration; understand, remember and carry out complex job instructions; behave in an emotionally stable manner; and relate predictably in social situations. The plaintiff's ability to function was noted to be seriously limited, but not precluded (fair), in the areas of follow work rules; relate to coworkers; use judgment with the public; interact with supervisors; understand, remember and carry out simple or detailed job instructions; maintain personal appearance; and demonstrate reliability. To support this assessment, Dr. Wadsworth noted the plaintiff has mental/emotional disabilities which severely limit her abilities to deal with stressful situations; has trouble concentrating and staying on task; and is very emotionally unstable with situations that are unpredictable (Tr. 592-594).

The plaintiff received treatment Nolachuckey Holston Area Mental Health from October 1, 2004 through November 30, 2005. Conditions and complaints addressed include history of abuse at the hands of various husbands, depression, severe anxiety, financial strain,

chronic severe pain, limitations in ambulation, crying spells, weight gain, frequent irritability, suicidal thoughts, ongoing relational problems with all of her adult children, agitation, feelings of failure, hopelessness, helplessness, panic attacks, sleep disturbance, hypomania, social isolation, ongoing conflicts with her neighbors and landlord, personality disorder, history of attempted suicide at age 15, bipolar disorder, conflicts with her boyfriend and his mother, paranoia, delusions, and mood swings (Tr. 595-619). On October 1, 2004, LCSW Mullins noted the plaintiff is severely and persistently impaired by her psychiatric impairments (Tr. 596). On December 9, 2004, the plaintiff's speech was rambling with somewhat of an odd tone of voice and articulation, she was significantly overweight, her mood was anxious, and she was frequently wincing in pain (Tr. 618-619). On December 22, 2004, the plaintiff was weeping profusely and her mood was dysphoric (Tr. 617-618). During January 2005, the plaintiff's affect was anxious and restricted, her mood was depressed, she focused a great deal on issues with her children, she rambled quite a lot throughout the session, and she reported feeling confused and trapped in the house (Tr. 616). On December 10, 2005, the plaintiff was very agitated, she felt like a failure, she expressed feelings of hopelessness and helplessness, her affect and mood were depressed, she was tearful throughout the session, and she reported anxiety and panic attacks (Tr. 615). During March 2005, the plaintiff was having relational problems with her boyfriend and both of her sons, she was fearful at her apartment, she was suffering increased anxiety, her affect and mood were depressed and anxious, and she reported crying on a daily basis (Tr. 614-615). During April 2005, the plaintiff obsessed over her daughter's substance abuse, she had been

experiencing a great deal of anxiety, her mood was depressed and anxious, she was having issues with all of her adult children, she continued to present somewhat hypomanic, and she was sleeping only four or five hours per night (Tr. 613-614). On June 21, 2005, the plaintiff was noted to have a history of depressive disorder and personality disorder, she was having an exacerbation of anxiety attacks, she had ongoing stressors with her children, and her speech was rapid and somewhat rambling (Tr. 611). On July 11, 2005, the plaintiff was having problems with her neighbors, her affect and mood were somewhat hyper, her speech was pressured, she focused on the anxiety caused by the people living in her apartment complex, her affect was anxious, her mood was somewhat hypomanic, and she was struggling with not being able to work and be independent (Tr. 610-611). On August 6, 2005, the plaintiff's speech was extremely pressured and rambling, she often got up and walked around the room demonstrating what she or others had done, she reported being a prisoner in her home due to the druggies living in her apartment building, she reported "divorcing" her daughter and grandson, she and her boyfriend had been having severe problems, her mood and affect were anxious and depressed, and she was somewhat histrionic (Tr. 609). On August 15, 2005, the plaintiff was extremely hyperverbal, her speech was pressured, she discussed issues with her son and daughter, her mood was hyper, and her affect was anxious (Tr. 609). In a yearly assessment dated August 22, 2005, the plaintiff's current GAF was 45, with her highest GAF being 55, and her lowest GAF being 45. The plaintiff was noted to be markedly limited in interpersonal functioning, with little social support and severe interpersonal problems with family and neighbors; moderately limited in activities of daily

living, with problems maintaining her household, no income, inability to work, and social isolation; moderately limited in concentration task and performance, with poor concentration and poor task completion; and moderately limited in her ability to adapt to change, with poor coping skills for dealing with stress and stress exacerbating symptoms (Tr. 597). On August 24, 2005, the plaintiff continued to obsess about her neighbors, she remained ostracized from two of her adult children, and her mood and affect were anxious (Tr. 608). The plaintiff was seen at the Takoma Emergency Room on September 29, 2005, at the request of the hospital after she had been transported there by EMS. The plaintiff talked about physical abuse by her husband, her speech was rapid, she rambled, she had lost weight, and she was sleeping two hours per night. On mental status exam, the plaintiff's attention required maximum redirection; her mood was cooperative and detached; her affect was nonchalant; she was obviously tense, restless, hyperactive, and anxious; her speech was over talkative, pressured, irrelevant, verbally aggressive, dramatic, rambling, obscene language, and rapid; her cognitive memory was at baseline level; and her judgment, impulse control and insight were fair. The diagnoses were depressive disorder NOS and personality disorder, with a GAF of 40. The plaintiff was advised to keep her upcoming appointment with Wylene Jacobs (Tr. 606-607). On October 5, 2005, the plaintiff presented with a paper stating she was charged with assault after being accused of threatening the grounds keeper at her apartment complex with a pocket knife. The plaintiff reported that her bail had been paid by her boyfriend and his mother, who then abused her physically and emotionally, wouldn't allow her to come out of the bedroom, made her use a coffee can to urinate in, and wouldn't allow her to eat her

food which was in the fridge. The plaintiff was extremely hyperverbal, her speech was pressured, she was dramatic and histrionic, she acted out situations which she was accused of or which happened to her, she was dramatic and angry, and she appeared manic with rapid, pressured speech. The plaintiff was worked in with AFNP Douglas for the same afternoon. Upon exam by AFNP Douglas, the plaintiff arrived very agitated and reported being arrest for bogus charges after displaying a knife during an altercation with a neighbor; she was angry about the hospital giving her the diagnosis of manic depressive; she was very agitated, with rapid speech and flight of ideas; she became aggressive alternating with tearful and passive; and she talked incessantly about ongoing conflict with her neighbors, boyfriend and daughter. On mental status exam, the plaintiff was extraordinarily agitated; she was unable to participate in conversation without becoming more agitated, defensive and angry; her speech was rapid; and her mood was dysphoric with congruent affect. The plaintiff's symptoms were noted to be strongly suggestive of paranoia, delusions and hypomania and she began to speak loudly and pace. At this point, the examiner felt it better to end the visit rather than attempt further discussion and assessment. The plaintiff left very tearful Tr. 603-605). On October 6, 2005, the plaintiff's speech was pressured and hyperverbal; she was afraid the medicine would hurt her; she didn't like the diagnosis of bipolar disorder; she reported being through with her boyfriend and was going to press charges against him for beating her; and her diagnoses were changed to bipolar disorder NOS and borderline personality disorder (Tr. 602-603). On November 2, 2005, the plaintiff was not getting along well with her boyfriend; she hated her boyfriend's mother since she held her hostage and

abused her daily; she felt trapped, hopeless and helpless; and she appeared somewhat manic (Tr. 601).

On August 25, 2005, Licensed Senior Psychological Examiner Wylene Jacobs opined the plaintiff has no useful ability to function (poor/none) in the areas of follow work rules; relate to coworkers; deal with public; use judgment with the public; interact with supervisors; deal with work stresses; function independently; maintain attention and concentration; understand, remember and carry out job instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. To support her assessment, Dr. Jacobs noted the plaintiff has constant verbal altercations with neighbors and family, causing inability to deal with public, relate appropriately with others, or deal with work stresses; her concentration and task completion is poor; and her personality traits impair personal social achievements (Tr. 573-575).

At another point in her brief the plaintiff refers to the report of four non-examining state agency physicians. Their opinions are summarized by the plaintiff as follows:

On December 29, 2003, a reviewing state agency physician opined the plaintiff is moderately limited in her ability to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. In the attached Drummond Case Analysis Sheet, Dr. Sachs opined there had been no improvement in the severity of the plaintiff's psychological symptoms or level of functioning since the prior ALJ decision (Tr.

421-439).

On February 5, 2004, a reviewing state agency physician opined the plaintiff can stand/walk for a total of only six hours in an eight-hour workday; can sit for a total of only six hours in an eight-hour workday; is limited in her ability to push/pull in the upper extremities; and can only occasionally climb, balance, kneel, crouch, and/or crawl. In the attached Drummond Case Analysis Sheet, Dr. Robbins opined there had been no significant improvement since the prior ALJ decision of May 18, 2001 (Tr. 447-454).

On June 26, 2004, a reviewing state agency physician opined the plaintiff can stand/walk for a total of only six hours in an eight-hour workday; can sit for a total of only six hours in an eight-hour workday; is limited in her ability to push/pull in upper extremities; and can only occasionally climb, stoop, kneel, crouch, and/or crawl. In the attached Drummond Case Analysis Sheet, Dr. Richard noted the plaintiff's limitations in the May 18, 2001, ALJ decision of light work with only occasional posturals, occasional overhead reaching, avoiding frequent head movements, and a need to sit or stand at will at least as often as one hour intervals. Dr. Richard opined that significant improvement had not occurred since the May 2001 ALJ decision (Tr. 486-495).

On July 12, 2004, a reviewing state agency physician opined the plaintiff was moderately limited in her ability to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. In the attached Drummond Case

Analysis Sheet, Dr. Kourany opined there had been no significant improvement since the ALJ decision of May 18, 2001 (Tr. 496-515).

An administrative hearing was held on November 23, 2004, before ALJ Davenport. ALJ Davenport took the testimony of Dr. Robert Spangler, a Vocational Expert. The hypothetical question of ALJ Davenport and the answer of Dr. Spangler are as follows:

> Q. Okay. If you would assume then that I find the claimant to be 53 years of age. Assume she's acquired a high school equivalency degree and did receive some training a number of years ago in electronics. Assume the claimant has the work background which you have described. First of all, if you'll assume the claimant is restricted to light work activity, which is work that requires lifting of no more than 20 pounds occasionally and 10 pounds frequently, if you assume the claimant would need an opportunity to change positions sitting or standing as frequently as every one hour, if you'll assume she cannot reach overhead on a frequent basis and cannot frequently interact with the public. Now with these restrictions, first of all would there be jobs that the claimant could perform that exist in significant numbers in the regional or national economy?
>
> A. Under the first hypothetical – excuse me – in light, high school, without other restrictions, there's 8,922,000 in the nation and 114,000 in the region, which is 150-mile radius of the Kingsport OHA office. However, with the sit/stand that would eliminate 80% of those jobs and with no overhead and no general public, I'd take another 10, so we're talking about 10% or 14,000 in the region, max. And it knocks out the biggest category, which is cashiers. Okay, no overhead, no public. Examples – information clerk, library clerk, record clerk, factory messenger, inventory clerk, general office clerk.

[TR. 646-47].

In his hearing decision the ALJ found that the plaintiff has the residual functional capacity to perform at the light level which includes lifting and carrying of 20 pounds occasionally and 10 pounds frequently, that she must be able to alternate between sitting and standing at one hour intervals, that does not involve overhead reaching, and which has

limited interaction with the public. Based upon Dr. Spangler's testimony the ALJ found that there were a significant number of jobs in the regional and national economy which the plaintiff could perform with those limitations. Accordingly the ALJ found the plaintiff was not disabled. [TR. 27-28].

The defendant Commissioner is correct that the court does not decide whether substantial evidence supports a finding of disability, but rather determines whether substantial evidence supports the ALJ. In the opinion of this court, there is substantial evidence to support the ALJ's residual functional capacity finding. Between the decision of ALJ Erwin on May 18, 2001, and the decision of ALJ Davenport on December 10, 2004, there was little evidence of any significant worsening of the plaintiff's condition, and adequate evidence that it had not worsened. The Commissioner is also correct that the jobs identified by the Vocational Expert do not require a functional capacity beyond that found by ALJ Erwin in 2001. Likewise, with respect to the opinions of the state agency consultants mentioned in the plaintiff's brief, the fact that they determined that the plaintiff had no significant improvement since ALJ Erwin's decision on May 18, 2001, is of no consequence, since on that date, as a matter of law, she was not disabled. Her condition did not need to improve.

However, there is a much more troublesome aspect to this record. The evidence presented to the Appeals Council documenting the plaintiff's treatment and examinations after the ALJ's decision, particularly the report of Dr. Hoppe (TR 588), the records of Nolachuckey Holston Area Mental Health Center (TR 596), and the report of Senior

Psychological Examiner Wylene Jacobs (TR 574), all contrast markedly with the opinions of Dr. Page and Senior Psychological Examiner Alice Garland, which provided much of the substantial evidence upon which ALJ Davenport based his decision.

42 U.S.C. § 405(g) provides that a reviewing court "may at any time order additional evidence to be taken before the Commissioner, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record...." which was before the ALJ. The Commissioner argues that the "plaintiff has neither requested remand based on this evidence, nor addressed the requirements for such a remand." *See*, Document 12, pg. 9, footnote 4. With respect to the first claim, the plaintiff did ask for a remand in the very last sentence of his brief. Also, he listed the evidence in his brief in detail.

Good cause is established because evidence of the deterioration of plaintiff's condition could not be presented prior to the time it deteriorated. Is the evidence material? "In order for the claimant to satisfy this burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711 (6th Cir. 1988). The question becomes, what must a plaintiff do to "demonstrate" the reasonable probability beyond including the evidence in the record and in the brief?

Very often, plaintiffs' attorneys will present evidence to the Appeals Council which

is just "more of the same" as the evidence presented to the ALJ, and then assert that a remand is appropriate. Or they will realize after the ALJ's decision that they failed to get the evidence they needed from treating sources to prevail on the claim, and present evidence which could have been obtained and presented to the ALJ. That, however, is not the situation here. With the opinions of Hoppe and Jacobs coming over one and one-half years after those of Page and Garland, it is impossible to say that the ALJ would not have given them controlling weight at that point in time. This plaintiff, by any measure, was "not disabled" at the time of ALJ Davenport's decision by the most slender of margins.

There was substantial evidence to support ALJ Davenport's decision of December 10, 2004, finding that the plaintiff was not disabled as of that date. But, the evidence presented to the Appeals Council was material, and good cause existed for it not having been presented to the ALJ. Accordingly, it is RECOMMENDED that the plaintiff's Motion for Summary Judgment [Doc. 9] be GRANTED, and that the case be remanded pursuant to Sentence Six of 42 U.S.C. § 405(g) for further consideration by the Commissioner to determine if plaintiff became disabled at any time after December 10, 2004.. It is also RECOMMENDED that the Motion for Summary Judgment [Doc. 11] of the defendant Commissioner be DENIED.[1]

Respectfully submitted:

---

[1] Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947-950 (6th Cir. 198l); 28 U.S.C. § 636(b)(1)(B) and (C).

_s/ Dennis H. Inman_
United States Magistrate Judge